[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10121

_____

D.C. Docket No. 1:18-cv-01041-AT

THE GEORGIA ELECTRONIC LIFE SAFETY & SYSTEM ASSOCIATION, INC.,
SAFECOM SECURITY SOLUTIONS, INC.,
A-COM SECURITY COMPANY, LLLP,

Plaintiffs - Appellants,

versus

THE CITY OF SANDY SPRINGS, GEORGIA,
RUSSELL K. PAUL,
in his individual capacity,
JOHN MCDONOUGH,
in his individual capacity,
JOHN PAULSON,
in his individual capacity,
CHRIS BURNETT, et. al.,
in his individual capacity,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(July 17, 2020)

Before ANDERSON and MARCUS, Circuit Judges, and ROTHSTEIN,[*] District Judge.

MARCUS, Circuit Judge:

Two alarm companies and a trade association to which they belong challenge a city ordinance and resolution adopted by the city of Sandy Springs, located in Fulton County, Georgia. The ordinance and resolution subject alarm companies to a series of fines when a false alarm is sounded at one of the properties which they service. The Plaintiffs claim that the city of Sandy Springs and its Mayor Russell Paul and City Manager John McDonough denied them the substantive and procedural due process protections found in the United States and Georgia Constitutions. They also forward a claim under Georgia law asserting personal liability against the Mayor, the City Manager, and individual members of the City Council (John Paulson, Chris Burnett, Tibby DeJulio, Andy Bauman, Ken Dishman, and Gabriel Sterling) for enforcing the ordinance. At the heart of their claims is the allegation that the true purpose of the ordinance is simply to generate revenue for the City, and that the ordinance has no reasonable relationship to any legitimate governmental interest.

The district court dismissed the substantive due process claims, finding that the ordinance and resolution were rationally related to a legitimate interest of the

---

[*] Honorable Barbara J. Rothstein, United States District Judge for the Western District of Washington, sitting by designation.

City, and it declined to exercise supplemental jurisdiction over the state-law claim. After thorough review and having taken oral argument, we affirm. The ordinance at issue is an economic regulation that does not burden any suspect classification or fundamental right, so rational basis review applies. The ordinance and resolution at issue easily survive rational basis scrutiny. Imposing a fine on the alarm companies is rationally related to the City's strong interests in reducing the number of false alarms that heavily burden its police and fire departments and waste public resources.

The Plaintiffs also attack the ordinance as violating their procedural due process rights, pointing to what they describe as insufficient procedural safeguards in the ordinance's appeal process. However, the Plaintiffs never lost an appeal under the ordinance, because they never attempted one. Nor have they explained how, absent an appeal, they were otherwise harmed by the allegedly deficient procedures in place. Instead, the Plaintiffs presented a factual list of the procedures at issue and summarily described them as flawed. Our case law is clear: there is no cognizable injury for standing purposes when a party fails to attempt an appeal and instead merely points to some procedural elements within a regulation, without alleging how those features injured them or even might potentially cause them some concrete harm. The Plaintiffs lack standing to pursue

3

this claim.  The district court properly dismissed it as being nonjusticiable.

Accordingly, we affirm the judgment of the district court in all respects.

I.

Plaintiffs Safecom Security Solutions, Inc. and A-Com Security Company, LLLP (two individual alarm companies), together with Georgia Electronic Life Safety & System Association ("GELSSA"), a non-profit trade association that represents alarm companies (together, "Plaintiffs"), bring this appeal.  The two alarm companies are members of GELSSA and serve customers across Georgia, including in Sandy Springs (the "City").  Around 80% of the premises in Sandy Springs are protected by alarm systems, with between ten and eleven thousand alarms installed in all.  These alarms are installed in a variety of locations across the City, including private residences, apartment buildings, commercial establishments, churches, schools, and government buildings.

When an alarm is triggered at one of these properties, a signal is transmitted to a "communications center" run by the alarm companies (or by a third party with whom they contract).  The communications centers resemble 911 dispatch rooms, and they are staffed and monitored twenty-four hours a day, seven days a week. Upon receipt of an alarm signal, an operator will reach out to the property owner in order to verify whether the breach was caused by the owner or an authorized user,

4

or if it was caused by an unauthorized intrusion.  Pursuant to O.C.G.A. § 35-1-9,[1] an operator must first call the site or alarm user directly; if no contact can be made, the alarm company must then reach out to a secondary contact number to attempt to verify the alarm.  If the owner cannot be reached and the alarm cannot otherwise be verified, the alarm company will then notify the relevant city emergency services agency and request a dispatch to the premises.  Alarm companies have no way to tell if an alarm activation was the result of criminal activity or another emergency, or if it resulted instead from user or technical error.

The Plaintiffs estimate that GELSSA members respond to around 775 alarm activations in Sandy Springs each year.  Of these, alarm companies verify and disable the alarm in 90% of cases.  For the remaining 10%, alarm companies request a dispatch from the appropriate Sandy Springs emergency services department.  This case revolves around false alarms, where emergency services are dispatched to a location but no emergency is apparent.  The Plaintiffs claim that

---

[1] The statute provides:

> "Alarm verification" means a reasonable attempt by an alarm monitoring company to contact the alarm site or alarm user, by telephone or other electronic means, to determine whether a burglar alarm signal is valid prior to requesting law enforcement to be dispatched to the location and, where the initial attempted contact cannot be made, a second reasonable attempt to make such contact utilizing a different telephone number or electronic address or number.

O.C.G.A. § 35-1-9(a)(2).

false alarms are largely attributable to "chronic abusers": 20% of alarm users trigger 80% of the false alarms.

In July 2017, the City of Sandy Springs passed Ordinance No. 2017-07-15 (the "Ordinance") and Resolution No. 2017-07-99 (the "Resolution").  The Ordinance "governs alarm systems intended to summon a public safety department and requires registration, assessment of fees for excessive false alarms, [and] provides procedures for repeat offenders."  Ordinance, § 18-34(b).  The purpose of the Ordinance "is to encourage alarm owners and alarm companies to properly use and maintain the operational effectiveness of alarm systems in order to improve the reliability of alarm systems and reduce or eliminate false alarms."  Id. § 18-34(a).

The Ordinance explains that false alarms burden the City's emergency services and waste resources.  Id.  In 2016 alone, there were 974 false fire alarms at $650 per dispatch, wasting roughly $657,450.  Resolution at 1.  There were also 9,292 false police alarm calls that year, costing around 4,424 man-hours and approximately $117,943.  Id.  In total, false police and fire emergency calls in 2016 cost the City around $775,939.  Id.  To combat this waste, the Ordinance established an escalating series of fines for successive false alarm calls, which the Resolution set at $25 for the first violation; $250 for violations two and three; and $500 for violations four and beyond.  Ordinance, § 18-41(a)(1), (b)(1); Resolution at 1.  In addition to a fine, the City's public safety departments will not respond to

an activated alarm at a property for one year after its fourth false alarm within a two-year period.  Ordinance, § 18-41(c).

False alarm fines under the Ordinance are imposed not on the property owner, but instead on the alarm company responsible for installing and servicing that alarm system.  Id. § 18-41(a)(1), (b)(1) (permitting civil penalties for each false alarm to "be assessed against an alarm company").  A false alarm is defined as:

> the activation of an alarm system to summon a public safety department that results in: (a) an inspection by a public safety department that indicates no fire, medical emergency, unauthorized entry, robbery, or other such crime was committed, occurred or attempted in or on the premises which would have activated a properly functioning alarm system; or (b) the cancellation of a request to summon a public safety department due to no emergency situation at the alarm site requiring response.

Id. § 18-35.  To enforce this provision, Sandy Springs designated a private entity, "Cry Wolf Services," as alarm administrator under the Ordinance.  Cry Wolf Services is responsible for implementing, administering, controlling, and reviewing false alarm reduction efforts and has unilateral discretion in determining whether an alarm call qualifies as a false alarm under the Ordinance.

The Ordinance also includes an appeals provision.  Under it, an alarm company can appeal a penalty or an enforcement decision "by filing a written notice of appeal with the police chief or the fire chief" within ten days of receiving

7

the fine or enforcement decision. Id. § 18-44(a). The Ordinance requires the police and fire chiefs to "each respectively designate a hearing officer" to "hear appeals related to their agency." Id. The hearing officer's decision can then be appealed directly to the police or fire chief. Id. The Ordinance provides that the decisions of the chiefs and the hearing officers are subject to judicial review "in the nature of writ of certiorari." Id. The Ordinance directs the hearing officer to review enforcement decisions using a preponderance of the evidence standard. Id. § 18-44(b). Failure to win the appeal subjects the appellant to costs. Id. § 18-44(d).

The Plaintiffs raise several claims, alleging violations of the United States and Georgia Constitutions under 42 U.S.C. § 1983. First, they say their substantive due process rights have been violated because the Ordinance is arbitrary and irrational. They also challenge the appeals procedure embodied in the Ordinance as violating procedural due process. In addition, they raise a supplemental state-law claim under O.C.G.A § 36-33-4 against Mayor Paul, City Manager McDonough, and the City Council defendants in their individual capacities, arguing that enforcing the alarm penalty scheme amounts to "engag[ing] in official acts oppressively, maliciously, corruptly, and without authority of law." The district court granted a motion to dismiss the constitutional claims but declined to exercise supplemental jurisdiction over the remaining state-law claim.

This timely appeal followed.

II.

"We review a district court's grant of a motion to dismiss with prejudice de novo, accepting the factual allegations in the complaint as true and construing them in the light most favorable to the plaintiff." Boyd v. Warden, Holman Corr. Facility, 856 F.3d 853, 863–64 (11th Cir. 2017) (alteration adopted and quotation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678.

A.

At the heart of this case is the claim that the Ordinance violates the Plaintiffs' substantive due process rights. They argue that their substantive due process rights were violated under both the Fourteenth Amendment and the Georgia Constitution. Georgia law appears to dictate that substantive due process claims arising under the Georgia Constitution be reviewed just like those arising under the United States Constitution, at least for those claims subject to rational

9

basis scrutiny.  See Ga. Dep't of Human Res. v. Sweat, 580 S.E.2d 206, 210–11 (Ga. 2003) (applying an identical rational basis test to substantive due process claims under both the United States and Georgia Constitutions).  The parties do not argue otherwise, so we discuss both claims together.  The district court measured the constitutionality of the Ordinance through the prism of rational basis review and concluded that the Ordinance was a perfectly reasonable regulation that fell well within the state's police power.  We agree.

When a law does not infringe on a fundamental right or discriminate on account of a suspect classification, but instead is a general economic regulation, we review it only for a rational basis.  See, e.g., Gary v. City of Warner Robins, 311 F.3d 1334, 1337 (11th Cir. 2002).  While much of our precedent has considered challenges to these types of regulations arising under the Equal Protection Clause, we have been explicit that the analysis for a claim arising under the Due Process Clause is "virtually identical."  See Wood v. United States (In re Wood), 866 F.2d 1367, 1371 (11th Cir. 1989) ("The standard for evaluating substantive due process challenges to social and economic legislation is virtually identical to the 'rational relationship' test for evaluating equal protection claims."); see also Fresenius Med. Care Holdings, Inc. v. Tucker, 704 F.3d 935, 945 (11th Cir. 2013) ("When a challenged law does not infringe upon a fundamental right, we review substantive due process challenges under the rational basis standard."); Leib v. Hillsborough

10

Cty. Pub. Transp. Comm'n, 558 F.3d 1301, 1308 (11th Cir. 2009) ("Like equal protection claims, substantive due process claims are subject to rational basis review, so long as they do not infringe fundamental rights and are not discriminatory."); Restigouche, Inc. v. Town of Jupiter, 59 F.3d 1208, 1214 n.6 (11th Cir. 1995) (explaining that "the rational basis inquiry is the same for equal protection and substantive due process challenges to zoning").

The rational basis test is "highly deferential to government action," and the regulation can only be invalidated if it is "so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." Jones v. Governor of Fla., 950 F.3d 795, 809 (11th Cir. 2020) (per curiam) (quoting Vance v. Bradley, 440 U.S. 93, 97 (1979)). When we undertake rational basis review, we ask "whether the government has the power or authority to regulate the particular area in question," and whether the proposed regulation has a "legitimate governmental purpose." Cash Inn of Dade, Inc. v. Metropolitan Dade County, 938 F.2d 1239, 1241 (11th Cir. 1991). We then ask "if there is any conceivable basis for the legislature to believe that the means they have selected will tend to accomplish the desired end," and if the method chosen to accomplish the stated goal "bears a rational relation to the ultimate objective." Id. (emphasis added). While not "toothless," Schweiker v. Wilson, 450 U.S. 221, 234 (1981) (quotation omitted), these requirements are "generally easily met. A

11

searching inquiry into the validity of legislative judgments concerning economic regulation is not required." Cash Inn, 938 F.2d at 1241. Because the Ordinance only regulates general economic matters, we review it only for a rational basis.

The Ordinance easily passes rational basis scrutiny because the means it has adopted -- fining alarm companies for false alarms -- are rationally related to the legitimate governmental interests in conserving public resources, eliminating waste, and decreasing the burden on emergency services provided by the police and fire departments. The district court cited to the substantial toll false alarms place on police and fire emergency response units, both in terms of money and time. And the district court properly concluded that "[l]ogically, such expenses of time and money detract from the City's ability to respond when truly needed"; therefore, the City has pursued a legitimate purpose.

Nevertheless, the Plaintiffs claim that at least two features of the Ordinance undermine the City's legitimate interests. First, they say, the City has no legitimate reason to impose a fine when a requested dispatch is near-instantly cancelled, no dispatch is sent out, and thus no costs are incurred. Second, they say, Sandy Springs does not have any legitimate interest in imposing liability for a false alarm where emergency response services have already been suspended at a particular address. We remain unpersuaded.

12

For starters, we do not micromanage the means adopted by a municipality when it regulates economic behavior for a legitimate governmental interest. Under rational basis review, the state is "not required to convince the courts of the correctness of their legislative judgments." Kentner v. City of Sanibel, 750 F.3d 1274, 1281 (11th Cir. 2014) (quoting Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 464 (1981)). Any challenge to the Ordinance must "negate every conceivable basis that might support it, even if that basis has no foundation in the record." Leib, 558 F.3d at 1306. And, our review under rational basis tolerates an imprecise match between means and ends. "Broad ('overinclusive') categories are valid even if greater precision, and more exceptions or subcategories, might be better, for the task of deciding how much complexity (at what administrative expense) is justified is legislative rather than judicial." Idris v. City of Chicago, 552 F.3d 564, 567 (7th Cir. 2009).

Even if the Plaintiffs were right, that in these two scenarios the City might suffer only minimal expense, or none at all, they ignore that the clear goal of the Ordinance is to encourage alarm companies and alarm owners to properly use and maintain the effectiveness of alarm systems in order to improve reliability and reduce false alarms. And it is indisputable that the costs associated with responding to hundreds of false alarms each year is substantial. Even if a false alarm costs the City nothing in one situation, it costs the City plenty in another.

13

And even if the City suspends a property owner's access to emergency response services, imposing a fine for a false alarm may well encourage the property owner to be more careful when services are reinstated, and will encourage alarm companies to more carefully train their customers.

The Plaintiffs also claim that the entire structure of the Ordinance, which imposes fines on alarm companies and not property owners, is not rationally related to any legitimate interest that the City of Sandy Springs may have.  Simply put, they say that the alarm companies cannot be made vicariously liable for the misconduct of their customers without running afoul of substantive due process. Again, we are unpersuaded.

As we see it, it is entirely rational for the City to penalize alarm companies for the false alarms of their customers.  For one thing, undoubtedly, alarm companies can influence the behavior of their customers.  They may devote more time and resources to training their customers (the property owners) about the proper use of alarm systems and the need for avoiding false alarms.  Moreover, they may sever their relationships with chronic abusers -- those customers who repeatedly set off false alarms.  They may draft their contracts with care and particularly address the chronic abuser.  And they can pass along any fees that have been imposed on them onto their customers, which would directly motivate property owners to avoid triggering false alarms.  Any of these possibilities would

14

satisfy the law's requirement that the means adopted be reasonably related to the ends of reducing false alarms and saving the public's money.  The City's Ordinance is rational -- it is designed to encourage alarm owners and alarm companies to properly use and maintain their alarm systems.  See Ordinance, § 18-34(a).  Finally, it seems to us perfectly rational for the City to conclude that it is administratively simpler and far less costly to consolidate fines for false alarms and focus liability on one party (the alarm company) as opposed to fining each property owner individually.  The long and short of it is that there are plenty of conceivable justifications for imposing vicarious liability on the Plaintiff alarm companies.  They possess sufficient means to affect the behavior of their customers.  This scheme is rational.

This is not the first time and we are not the first circuit to address a problem of this kind.  Thus, by way of example, the Seventh Circuit considered a similar problem in reviewing a local ordinance through the prism of rational basis scrutiny in Idris v. City of Chicago.  There, the plaintiffs challenged an ordinance which fined the owner of a car for running a red light even if the owner was not driving at the time of the violation.  552 F.3d at 565.  The plaintiffs argued that imposing such a fine violated substantive due process.  Id. at 565–66.  The Seventh Circuit rejected the claim, holding that the law was rational because the car owner was quite able to influence the behavior of the offending party -- the driver -- by

15

insisting on reimbursement or by refusing to let the party use the owner's car again. Id. at 566. "Owners will take more care when lending their cars, and often they can pass the expense on to the real wrongdoer." Id. Rational basis scrutiny requires nothing more.

In this case, however, the Plaintiffs argue that upholding the City's vicarious liability regime would allow it to fine anybody any time it wants to, using by way of example the act of fining a homeowner for a neighbor's music being played too loudly. But that scenario is worlds apart from the reality of this Ordinance. As we already observed, the alarm companies can reduce their liability by cutting off services to rampant abusers, by shifting costs to those abusers, by redrafting their contracts accordingly, or by training their customers to use their alarm systems more carefully.

The district court properly found that the Ordinance and the Resolution pass rational basis scrutiny.[2]

---

[2] During oral argument, the Plaintiffs also claimed that, at the motion to dismiss stage, we must construe the facts in their favor and find that they are unable to influence their customers. While we accept the Plaintiffs' factual allegations as true at this stage, Boyd, 856 F.3d at 863–64, our task under rational basis review is to imagine any conceivable, rational basis for the government's law, Cash Inn, 938 F.2d at 1241. The Plaintiffs pointed the Court to a statement in their complaint that "alarm companies are not in a position to be able to supervise, direct, or control their customers' actions." Even so, the Plaintiffs did not say, nor could they have said, that they could not affect or influence their customers' behavior. In any event, while we are obliged to take the factual allegations in their favor, we need not take "mere conclusory statements" like this one as true. Iqbal, 556 U.S. at 678. The procedural posture of this case does not compel a result different from the one we reach.

16

B.

The Plaintiffs also challenge some of the appellate procedures found within the Ordinance, because they say some of those procedures violate their procedural due process rights by failing to provide adequate safeguards against the wrongful imposition of fines.[3]  Specifically, they claim the appeal process is "meaningless" because there is no opportunity to be heard before a fine is imposed; the appeals window is only ten days; there is no in-person hearing, and appeals are resolved on paper; there is no meaningful process to collect evidence; there is no investigation as to the source of the false alarm; and appeals can be summarily rejected, without explanation or reasoning.  The district court ruled that the Plaintiffs lacked standing to assert these claims because they "failed to demonstrate the basic standing requirement of causation between their own injury and the challenged procedural deficiencies" in the Ordinance.  The district court determined that because the Plaintiffs never took an appeal from the imposition of any fines and never utilized the procedures found in the Ordinance, they could not show causation.  We agree the Plaintiffs lack standing to bring these procedural due process claims.

---

[3] Just as with substantive due process, Georgia law suggests that a procedural due process claim arising under the Georgia Constitution is analyzed similarly to a Fourteenth Amendment procedural due process claim.  See Schumacher v. City of Roswell, 809 S.E.2d 262, 265 (Ga. Ct. App. 2017).  What's more, the parties do not claim that the analysis should differ, so we discuss both Counts II and IV together.

17

Our Court addressed a similar challenge in <u>Granite State Outdoor Advertising, Inc. v. City of Clearwater</u>. There, the plaintiff attacked an ordinance regulating the allowable size of advertisement billboards. 351 F.3d 1112, 1115 (11th Cir. 2003). The plaintiff claimed the appeals process following a permit denial was constitutionally defective because it afforded the city unlimited time to decide an appeal. <u>Id.</u> at 1117; <u>see also</u> <u>Granite State Outdoor Advert., Inc. v. City of Clearwater</u>, 213 F. Supp. 2d 1312, 1323 (M.D. Fla. 2002) (explaining that the plaintiff was challenging the regulation on the grounds that "it contains no time limits for the appeals process"). We concluded that the plaintiff lacked standing because at issue was "an appeals process that the plaintiff chose to forego without showing any actual or potential harm caused by the challenged appeals process." <u>Granite State</u>, 351 F.3d at 1117 n.5.

In so doing, a panel of this Court focused on identifying the injury resulting from an allegedly deficient appellate process. We explained that a plaintiff must allege an injury arising from the claimed procedural defect; summarily asserting that there was a procedural flaw without testing it was not enough. <u>See id.</u> at 1117 ("The specific constitutional defect, according to Granite State, is the fact that City officials have an unlimited amount of time to decide whether to grant or deny a permit application. Such an argument, <u>by itself</u>, does not create Article III standing." (emphasis added)). In <u>Granite State</u>, there was no standing because the

plaintiff had "neither alleged nor shown how the City's permitting and appeals procedure" caused it any injury. Id. Even though the appeals process allowed an indefinite timeline for review, that process was never invoked, and the permit itself was denied without delay. See id. (observing that "the record shows that Granite State's permits were denied within a reasonable time: the same day they were submitted"). Simply put, the plaintiff failed to establish an injury from an appeals process it "chose to forego," and it similarly failed to allege an actual or potential injury inherent within the procedure without ever attempting an appeal. Id. at 1117 n.5.

To be clear, when a plaintiff lodges an appeal and that appeal is denied, the denial itself may show that the plaintiff has been injured, or at least provide some evidence of injury. If instead a plaintiff chooses to forego an appeal and also does not allege how the defective process otherwise caused or could cause any injury absent an appeal, then there is no injury for standing purposes. Id. By way of contrast, had the Granite State plaintiff concretely alleged, for example, that an indefinite review period resulted in uncertainty which increased its financing costs, that might have been a cognizable injury for standing purposes, even without having attempted an appeal. But as Granite State makes clear, a plaintiff has "neither alleged nor shown" injury by merely arguing in the abstract that a procedure is flawed. Id. at 1117.

19

The Plaintiffs in this case lack standing because they never attempted to use the appeals process embodied in the Ordinance, nor did they explain how any allegedly deficient element in the Ordinance caused them any actual or potential harm absent taking an appeal.  Instead, they presented, and only at the highest order of abstraction at that, a factual list of some of the procedural elements of the Ordinance and summarily alleged that they were flawed; but they never explained how or why any of these claimed flaws resulted in any cognizable injury.

Thus, for example, the Plaintiffs claimed that the ten-day window to file an appeal was too short to allow for a meaningful opportunity to gather evidence.  However, a prescribed period in which to collect evidence is not, in the abstract, an injury.  In Lujan v. Defenders of Wildlife, the Supreme Court made clear that standing requires (1) a "concrete and particularized" injury which is "actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) that the injury is "likely" to "be redressed by a favorable decision."  504 U.S. 555, 560–61 (1992) (quotations omitted).  We have no way to determine whether the Plaintiffs were in fact injured by this allegedly brief timeframe; whatever injury might exist is not sufficiently concrete, nor have the Plaintiffs established how any putative injury was caused by some deficiency in any of the Ordinance's appellate procedures.  Inasmuch as the Plaintiffs never attempted an appeal, we do not know and cannot discern what

20

evidence they might have discovered but didn't, given the time constraints. And we cannot determine, even hypothetically, whether they would have been more likely to emerge victorious from an appeal if they'd had the benefit of a longer filing window.

Thus, by way of example, had they appealed and lost, the Plaintiffs might have alleged that they were unable to collect as much evidence as they aimed to. But by failing to even attempt an appeal, the Plaintiffs leave us only to speculate about how they might have been harmed by a ten-day filing period. Cf. Women's Emergency Network v. Bush, 323 F.3d 937, 944–45 (11th Cir. 2003) (explaining that a "speculative injury [is] insufficient to satisfy Lujan's injury-in-fact requirement"). Nor did the Plaintiffs allege that they suffered any actual or potential harm even absent an appeal. Perhaps they could have alleged, for example, that they were barred from pursuing an appeal because the costs of collecting evidence so quickly would have been prohibitive. Instead, the Plaintiffs just complain, and only in the most general way, that the filing period did not allow a meaningful opportunity to collect evidence, without any explanation about how the length of time may have been injurious to them.

The Plaintiffs also complain that appeals are resolved on the papers and without a hearing. But again, the Plaintiffs utterly fail to explain how the resolution of a false alarm fine only on the papers presented would cause them any

21

actual or potential harm, nor could we easily imagine any injury of this kind. Cf. Idris, 552 F.3d at 567 (rejecting plaintiffs' claim that an ordinance violated procedural due process by restricting defenses available at a hearing because "[n]one of the plaintiffs has offered such a defense and had it rejected; federal courts do not issue advisory opinions on situations that do not affect the litigants"). Merely saying that the appeals process does not include a hearing, without alleging something more, does not meet the requirement to plead a concrete and particularized injury for standing purposes. The Plaintiffs' arguments concerning the other alleged flaws in the appeals process fail for similar reasons. Nor, finally, have they sufficiently explained why they could not appeal from an unfavorable ruling issued by the police or fire chief to a state circuit court in Georgia, a provision expressly provided for in the Ordinance. Ordinance, § 18-44(a); see also O.C.G.A. § 5-4-1(a) ("The writ of certiorari shall lie for the correction of errors committed by any inferior judicatory or any person exercising judicial powers . . . ."); State v. Int'l Keystone Knights of the Ku Klux Klan, Inc., 788 S.E.2d 455, 463 (Ga. 2016) (explaining that administrative determinations are adjudicative in nature when they are "immediate in application, specific in application, and commonly involve an assessment of facts about the parties and their activities, businesses, and properties" (citations and quotation omitted)); Mack II v. City of Atlanta, 489 S.E.2d 357, 361 (Ga. Ct. App. 1997) (finding a writ of certiorari

22

available under O.C.G.A. § 5-4-1 where "the hearing officer acted judicially, rather than administratively, in hearing argument and applying the law as the officer interpreted it to the facts before it").

Since the Plaintiffs have not appealed any fine to the police or fire chief, or to the courts, and since they only listed some of the Ordinance's appellate procedures without offering any explanation of how or why the alleged defects injured them (or would have harmed them had they attempted an appeal), the Plaintiffs lack standing to bring their procedural due process claims, and the district court properly dismissed them.[4]

We also affirm the dismissal of the Plaintiffs' remaining claims.  We agree with the district court that Count VI, which pursued a stand-alone due process claim under 42 U.S.C. § 1983, is wholly duplicative of the Plaintiffs' constitutional claims and fails for the same reasons those claims failed.  And we affirm the dismissal of Count V, because the district court did not abuse its discretion in

_____

[4] Our Court's recent decision in Worthy v. City of Phenix City is not in tension with our conclusion.  There, the plaintiffs attacked a law imposing a fine for running a red light, targeting "the constitutionality of the ordinance as a whole."  930 F.3d 1206, 1214 (11th Cir. 2019).  The alleged injury was clear -- the fine resulting from violating that ordinance -- and we found standing.  Here, however, the Plaintiffs specifically targeted only some of the appellate procedures found within the Ordinance.  Indeed, at oral argument, we asked the Plaintiffs to point us to where in their pleadings they attacked the procedures of the Ordinance more broadly.  They were unable to do so.  Because the Plaintiffs' specific and repeated language throughout their pleadings and briefs attacks only some of the appeals process itself, and not the Ordinance as a whole, Worthy offers them no relief.  And even were there any tension between Granite State and Worthy, Granite State controls our review as the older precedent.  See Local Union 48 Sheet Metal Workers v. S.L. Pappas & Co., 106 F.3d 970, 975 (11th Cir. 1997).

23

declining to exercise supplemental jurisdiction over the state-law claim, since the federal claims have been dismissed.  See 28 U.S.C. § 1367(c)(3); Milan Express, Inc. v. Averitt Express, Inc., 208 F.3d 975, 981 n.3 (11th Cir. 2000).

**AFFIRMED.**